THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ANDREW J. HORVATT and Others, Defendants.*

In the Matter of the Application of MICHAEL J. HORVATT to Vacate and Quash a Subpoena Duces Tecum Purporting to Have Been Issued by the Attorney-General of the State of New York.

Supreme Court, Broome County, December 16, 1931.

*Buck, Ames & Coon* [*Clayton R. Lusk* of counsel], for the defendants Thomas J. Mangan, Sigmund A. Friedlander, Elmer J. Churchill and Massoud Ellis.

*Lee, Levene & Verreau* [*A. E. Gold* of counsel], for the defendant Joseph Greskovick.

*Chernin & Gold* [*A. E. Gold* of counsel], for the defendant Michael J. Horvatt.

*John J. Bennett, Jr., Attorney-General* [*John T. Cahill, Assistant Attorney-General*, of counsel], for the People.

PERSONIUS, J. From the petitions, answers and voluminous affidavits it appears that the moving parties were directors of the State Bank of Binghamton from its organization, January 1, 1924,

---

* See, also, 139 Misc. 814.

until it was taken over by the Superintendent of Banks for liquidation December 15, 1930. On September 26, 1931, subpœnas were served requiring each of said directors to appear before the Attorney-General to testify in regard to " matters relating to the practices of State Bank of Binghamton and others in the issue, negotiation and sale of securities " and to produce books and papers " relating to the State Bank of Binghamton in your possession." We think it may be safely said that the " securities " referred to was the stock of the State Bank of Binghamton and no other. The Assistant Attorney-General, in his affidavit verified October sixth, avers that " evidence of fraud in connection with the issuance, negotiation and sale of stock of the State Bank of Binghamton has been brought " to the Attorney-General's attention. It is nowhere suggested that the investigation of the sale of any other securities is desired.

It also appears that prior to January 1, 1924, Andrew J. Horvatt conducted a private bank in Binghamton; that during 1923 plans for the incorporation of said bank as a State Bank were under discussion with the State Banking Department. By July twenty-fourth a tentative plan for its incorporation had been agreed upon, and on December 31, 1923, authorization for said bank to commence business was issued by the Superintendent of Banks.

Its original capital was $100,000 and $25,000 surplus. All of its stock was subscribed for by the directors, Andrew J. Horvatt subscribing for nine hundred and forty shares. There were issued to the petitioners here ten shares each, with one exception — Mr. Churchill receiving twenty shares. The entire $125,000 of capital and surplus was paid in cash and was on deposit in a New York bank to the credit of the Binghamton State Bank. Immediately upon the latter's organization, it purchased the real property and fixtures of said Andrew J. Horvatt for $90,000, which sum was paid to him from the capital and surplus so paid in. However, it also appears that this purchase was contemplated in the plan submitted to the Superintendent of Banks. The purchase was to be " on the basis of the appraisal made under the direction of the Banking Department." The Banking Department obtained an appraisal from an appraiser of its own choice.

The Binghamton State Bank seems to have been organized and its stock issued and paid for in a manner approved by the State Banking Department after making investigation and examination. All the stock was issued to its directors, except that a small portion of the stock subscribed for by Andrew J. Horvatt may have been issued at his request to other persons nominated by him.

No stock was offered on the market to the public and the petitioners show that there have been no sales of or dealings in this stock

since it was issued except that a small amount was repurchased by said Andrew J. Horvatt, a director. The Attorney-General does say that the stock book contains " a record of *a* dealing in shares of said stock as late as May 19, 1930." There is nothing to show that this is not a record of one of the admitted purchases of stock by said Andrew J. Horvatt. We think it must be conceded that the Attorney-General has shown no *facts* warranting an investigation with reference to any dealings in this stock. The Attorney-General's answers allege that he " has a good and substantial basis for an investigation under Article 23-A of the General Business Law." However, he alleges no facts to support this conclusion but takes the position that he is not called upon to show any facts justifying an investigation.

The petitioners here seek to vacate and quash the subpœnas issued by the Attorney-General. They argue that when they show facts establishing, *prima facie*, that there is no basis for an examination under the Martin Act (Laws of 1921, chap. 649, as amd.), the Attorney-General is called upon to show sufficient facts to indicate that the propriety of such examination is at least a question of fact. The petitioners impliedly admit that if the Attorney-General makes such a showing and has resolved this question of fact, and determined that such examination was proper, the court should not interfere. The Attorney-General replies that he cannot, under any circumstances, be called upon to show facts warranting a Martin Act investigation, even in the face of a *prima facie* showing that there is no basis in fact for such investigation.

The petitioners go farther. Not only do they say that the facts in the instant case do not bring it within the intended purpose of the Martin Act, or warrant an investigation thereunder, but they also allege that the proposed investigation is an attempt to examine the petitioners in advance of their trial on a criminal indictment, and, therefore, in violation of their rights. It appears that all these petitioners are under indictment under section 297 of the Penal Law, charged, in substance, with negligence in the administration of the " affairs " of the bank. They argue that this investigation involves the same " affairs " of the bank and conclude that the proposed examination under the Martin Act would be in effect an examination of the petitioners before their trial under the indictments. In support of their position, they also point out that by order of the Governor, the Attorney-General has superseded the district attorney of Broome county in the prosecution of these indictments, and that the Assistant Attorney-General, who is seeking this investigation under the Martin Act, is now in charge of the prosecution of the indictments.

The questions thus raised are fairly simple to state. Is the Attorney-General empowered by the Martin Act to investigate the issuance and sale of stock at his sole pleasure and discretion? Has this court no control, under any circumstances, over such investigation, at the instance of those he seeks to examine? If it has such control, can it be exercised on these petitions or only in an action for an injunction?

We have deemed it proper to state the facts presented and the questions raised notwithstanding our conclusion that we cannot in these proceedings grant the relief sought by the petitioners.

It would seem that in a proper proceeding, and under certain circumstances, the courts have power to exercise some control over such an examination. We think the courts have so indicated. In *Dunham* v. *Ottinger* (243 N. Y. 423) the Court of Appeals, upholding the constitutionality of the Martin Act, said (p. 438): "* * * this statute is by no means lacking in substantial provisions by which to safeguard its execution. Any inquiry under it must be relevant to the purposes proposed by it; any person of whom examination is sought is immune from punishment for a refusal to answer unreasonable questions or to comply with unreasonable requests; he is protected, if he asks the privilege, from the use of any testimony which he may give in criminal proceedings * * * in *addition* to these specific means of protection the courts will always be open for any appeal by one who is being persecuted." In other words, the court said that a person whose examination is sought has not only the protection specifically provided by the statute, but *in addition* may, under proper circumstances, come into court for relief. The power of the court to protect parties against improper or unjust examination is also recognized in *Producers Royalty Co.* v. *Ottinger* (129 Misc. 694, 697), and *Matter of MacNamara* (128 id. 84, 93).

To require a layman, subpoenaed for examination, to take the position that his answers might incriminate him, or to determine at his peril whether a refusal to answer would be with or without "reasonable cause" seems unfair. Lawyers and courts might disagree as to what was reasonable cause. (*Matter of MacNamara*, 128 Misc. 84, 93.)

We incline to the view that the courts have some control over such an examination, under proper circumstances, and in a proper action. We do not now pass upon the question whether the circumstances of these cases warrant interference. These applications must be denied for the reason that they are not made in an action for an injunction. (*Matter of Marcus*, 139 Misc. 675, 681; affd., 232 App. Div. 731; appeal dismissed, 255 N. Y. 630.) It is true

that applications of this nature have been made by petition, for instance, *Matter of MacNamara* (128 Misc. 84; affd., 218 App. Div. 822). However, the question as to the legality of such practice was not raised and it seems to be settled in *Matter of Marcus* (*supra*), that the relief here demanded can only be had in an action for an injunction. The petitions must, therefore, be dismissed.

Submit orders accordingly.